UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

DARA L. D'ADDIO                                     15-cv-05497-JGK
            Plaintiff/Counterclaim Defendant

        -against-

                                                    **COUNTERCLAIMS**

BERNARD B. KERIK, HALA KERIK,
VICTORIA SANDERS & ASSOCIATES, LLC,
and SIMON & SCHUSTER, INC.,

            Defendants.
_____

BERNARD B. KERIK,

            Counterclaim Plaintiff,

        -against-

DARA L. D'ADDIO,

            Counterclaim Defendant,

DONNA M. D'ADDIO

            Additional Counterclaim
            Defendant.

----------------------------------------------------------X


        As and for his Counterclaims against Plaintiff/Counterclaim Defendant Dara L. D'Addio

and Additional Counterclaim Defendant Donna M. D'Addio (collectively, "counterclaim

defendants"), Bernard B. Kerik ("Kerik") alleges as follows:

    1.  Dara L. D'Addio is a resident of the State of New York.

    2.  Donna M. D'Addio is a resident of the State of New York.

    3.  Bernard B. Kerik is a resident of the State of New Jersey.

4.   This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. §1332.  The Defendant is a citizen of a state different than that of the Plaintiff and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Plaintiff also invokes the supplemental jurisdiction of this Court with respect to claims based upon the laws of the State of New York, pursuant to 28 U.S.C. § 1367.

5.   Venue is proper in this District as a substantial part of the events giving rise to the claims herein occurred in the Southern District of New York.

## BACKGROUND

6.   These counterclaims arise out of the persistent and dangerous cyberstalking and cyberbullying tactics of Dara D'Addio, a mentally unstable woman who has developed an unhealthy and alarming obsession with Mr. Kerik.  Ms. D'Addio used to be acquainted with Mr. Kerik and assisted him with certain things, but formed a delusional perception of their relationship, describing herself as Mr. Kerik's "Bashert angel," using a Yiddish word which has a religious reference to describe her belief that she was Mr. Kerik's divinely preordained soulmate and spouse. Mr. Kerik, however, did not share Ms. D'Addio's feelings, as he considered their relationship completely platonic.  This caused Ms. D'Addio to begin a downward spiral of increasingly alarming and dangerous behavior, targeting Mr. Kerik, his family, friends, and associates.

7.   Kerik served as the 40th New York City Police Commissioner, where he gained national recognition for his strong leadership of the NYPD during and after the 9/11 attacks.

8.   After withdrawing his name from consideration for Secretary of Homeland Security, Kerik came under both state and Federal investigation.  He ultimately pleaded guilty and was sentenced to four years' incarceration.

2

9.     While he was incarcerated, he met Dara D'Addio, who had written to him and offered to volunteer her time assisting him.  Mr. Kerik accepted Dara D'Addio's invitation and the two became friends.

10.    Unbeknownst to Mr. Kerik at the time, Dara D'Addio suffers from severe mental illness. Many years ago, she briefly served as a Police Officer with the Hartford Police Department but, on information and belief, had been terminated or forced to resign from that position for misconduct and/or psychological problems.

11.    While Mr. Kerik believed that his relationship with Dara D'Addio was based on mutual trust and friendship, the reality is that Dara D'Addio developed an unhealthy and potentially dangerous obsession and fixation on Mr. Kerik.

12.    During their initial friendship, Dara D'Addio informed Mr. Kerik that she had a twin sister, Donna D'Addio. On information and belief, Donna D'Addio suffers from a substantially identical severe mental illness and the two sisters live together. Donna D'Addio has previously been incarcerated, and has a felony record for her unstable and dangerous behavior including, but not limited to, engaging in an obsession and fixation of a man once married to her mother, which culminated in her carving "GET OUT MUSLIM BASTARD" on the side of his home.

13.    On information and belief, the D'Addio sisters are tech savvy (Dara D'Addio, publicly admitting that she is an "old school hacker"), mentally disturbed, and relentlessly obsessed with Mr. Kerik and anyone even tangentially associated with him. Living together, they have combined forces to engage in a constant, around the clock cyberstalking and defamation campaign of terror against Mr. Kerik, his family and associates.

14.     On information and belief, Dara D'Addio is employed by GlobalFoundries, a company which produces advanced semiconductor technologies, such as computer chips for smart phones.  In her position, Ms. D'Addio has access to sensitive materials and advanced computer systems, which she uses to further her activities.  A large amount of her online activities occur while she is at work and involve her revealing private information about her targets, which, on information and belief, she uses GlobalFoundries' resources to access.

15.     Because all of these activities have taken place online, using a wide array of anonymous and false identities, it will be impossible, without discovery, to separate which sister made each individual anonymous public message posting, of which there are tens of thousands.

## STATEMENT OF FACTS

16.     For more than two years Counterclaim Defendants have engaged in an unprovoked personal terror campaign in which they have publicly targeted, stalked, threatened, and harassed the Defendant, his family, business associates and friends (including his two young daughters), through the use of dozens of anonymous social media and Internet accounts, that have been used for the sole purpose of alarming, frightening, and harming Mr. Kerik personally, professionally and financially.

17. Upon information and belief, Counterclaim Defendants created, maintained and operated the following, but not limited to, anonymous blogs, websites and Internet accounts:

   a.  Doingtimewithbernie.com
   b.  Doingtimewithbernie.blogspot.com
   c.  FACEBOOK: https://www.facebook.com/BernieKerikBlog
   d.  TUMBLER: doingtimewithbernie.tumblr.com
   e.  VIMEO: https://vimeo.com/74066648
   f.  SCOOPIT:http://www.scoop.it/t/bernard-
    kerikberniekerik/?tag=DoingTimeWithBernie.com

18. On information and belief, Counterclaim Defendants created, maintained and operated the following, but not limited to, anonymous Twitter accounts for the sole purpose of targeting, stalking and publically attacking, threatening and harassing Mr. Kerik, his family and his friends and supporters, by publicly posting tens of thousands of vile, slanderous, defaming and alarming messages, to harm Mr. Kerik personally, professionally and financially.

a. @Wisdom01001010
b. @TheShameisYours
c. @GGIustitia
d. @DDwithABrain
e. @AbbyAngelPotter
f. @MyTimeWithB
g. @Frankiedoestwit
h. @DoingTimeWithB
i. @DoingTimeWithBB
j. @FallForwardNow
k. @DoingTimeBBK
l. @LuvMyInmate
m. @TheKerikGropus
n. @TheKerikGropu
o. @TheKerikGropur
p. @JohnPiccianoJrt
q. @BernieKerikBlog
r. @BKerikBlog
s. @DrLMPonte
t. @DonFranco
u. @RosadoBronx
v. @JailertoJailed
w. @Onhold4u2
x. @NotBernardKerik
y. @KerikBlogger
z. @HeLiesALotMore
aa. @MyTimeWithBB
bb. @DTWBLFC
cc. @LFCDTWB
dd. @LFCDTWBCom
ee. @AngelOutoftheB
ff. @PaperBagBiotch
gg. @HeyYou84888054
hh. @VeritaDEA
ii. @DTWBLetters
jj. @CumberlandFPC

19.     Counterclaim Defendants have engaged in almost daily attacks on Mr. Kerik, his family, associates, and supporters.  These alarming attacks include not only the standard fare of false and defamatory statements, but also veiled threats and the release of personal information.

20.     For example, one woman who barely knows Mr. Kerik ("Individual A"), tweeted a holiday message to Mr. Kerik on April 2, 2015.  As a result of this brief, but innocent exchange, Counterclaim defendants have waged a non-stop campaign against this woman, falsely accusing her of making death threats against Dara D'Addio, falsely claiming that Individual A is a person of interest by the Clarkstown Police Department and falsely claiming that her arrest is imminent. In reality, the Clarkstown Police Department was investigating Counterclaim Defendant's activities. On information and belief, Counterclaim Defendants have made threatening phone calls to Individual A at all hours of the night and gone to this woman's home and publicly posted photos and the address of her home, as well as photos of her son and family.  In particular, Counterclaim Defendants have also targeted Individual A's son, who is currently attending law school.

21.     Another example of an attack on an associate of Mr. Kerik's is when Private Investigator John Curley was hired by another of Counterclaim Defendant's victims (Not Mr. Kerik or Individual A) to communicate with Dara D'Addio's attorney in an attempt to have her cease  public attacks on Mr. Curley's client.  Although Mr. Curley left Counterclaim Defendant's attorney, Autondria Minor two messages, Ms. Minor never returned the phone calls and in retaliation, Counterclaim Defendants began posting online false accusations against Mr. Curley, claiming that he had threatened her, her family and her attorney on Mr. Kerik's behalf. Counterclaim Defendants further published wildly false allegations that Mr. Curley and Individual A appeared at their home to threaten Dara D'Addio.

22.     Additionally, Dara D'Addio has been constantly harassing members of the U.S. Department of Probation with incessant phone calls regarding a wide array of false claims against Mr. Kerik, in a desperate attempt to have him arrested. These false accusations include, but are not limited to, claims that Mr. Kerik has been threatening her. She has also relentlessly been asking for a copy of Mr. Kerik's conditions of release, falsely claiming that he is prohibited from contacting her. On information and belief, Ms. D'Addio is attempting to mislead a state judge in Saratoga to issue an arrest warrant for Mr. Kerik for violating a non-existent no-contact order that was completely invented by Ms. D'Addio.  The pattern of these wild attempts are usually timed before court appearances in this matter.

## AS AND FOR THE FIRST COUNTERCLAIM

### Defamation *per se*

23.     Counterclaimant repeats and realleges all the statements contained in the above paragraphs as if fully realleged herein.

24.     Beginning on July 7, 2013 until present, the Plaintiff has engaged in an unprovoked personal terror campaign in which she has targeted, stalked, threatened, and harassed Mr. Kerik, his family, business associates and friends (including his two youngest daughters), through the use of dozens of anonymous social media and Internet accounts, that have been used solely for the purpose harming the Defendant personally and financially. In doing so, she has impersonated him on social media, created fictitious social media accounts representing his company, impersonated his friends and former colleagues, and published numerous non-privileged, false and defamatory

statements about Mr. Kerik on her various websites, blogs, and social media profiles.  These statements include, but are not limited to[1]:

    a.  On July 7, 2013, the Plaintiff created a Facebook account, impersonating the Defendant, and began sending negative and defamatory messages to the Defendant's Facebook contacts.

    b.  On information and belief, between March 1, 2014 and March 17, 2014, the Plaintiff created three (3) fictitious Twitter accounts representing Mr. Kerik's company, and then publicly posted negative messages on those Twitter accounts in an attempt to harm Mr. Kerik personally, professionally and financially.

    c.  At 8:03AM, April 2, 2015, Dara D'Addio publicly posted that a former NJ Governor was paying Mr. Kerik to speak, writing: "Man of God, Jim McGreevey hosts Felon liar on probation #plagiarist @BernardKerik gets paid to speak on finding work! #hypocrites @JCETP" In reality Mr. Kerik was sitting on a panel on criminal justice reform, for which he was not being compensated. Dara D'Addio's statement and message was a false statement made with the intent to contradict public statements Mr. Kerik had made about not having permanent employment.

    d.  At 1:58PM on April 2, 2015, after seeing that a woman on Mr. Kerik's Twitter account wished him and his family a Happy Easter, Dara D'Addio verbally attacked the woman, who then filed harassment and abuse reports with Twitter against Dara D'Addio. In response to the woman's complaint of being harassed, Dara D'Addio then flooded the Internet with a number of derogatory, vial and sexually explicit messages and then

---

[1] These examples are by no means an exhaustive list, as there have literally been tens of thousands of statements made. These are presented in chronological order, however, Counterclaim Defendants' behavior has become increasingly alarming as time goes on.

targeted the woman and her family by publicly posting photos of the woman's residence, as well as her actual address on the internet, resulting in the woman filing a criminal complaint with the Clarkstown (NY) Police. At 11:18AM on February 24, 2015, Ms. D'Addio publicly posted a Twitter message to hundreds of followers that Mr. Kerik was using that woman to "cyberbully" her. Not only was Ms. D'Addio fully aware that her statement was a blatant lie, she was in fact, the instigator who had attacked this woman, for no other reason than wishing Mr. Kerik and his family Happy Easter.

e.  After seeing another woman mentioned in Mr. Kerik's book, she publicly attacked this woman by posting disturbing messages about her on social media, which resulted in that woman reporting her alarming conduct and behavior to the Ballston Spa Police Department.

f.  Over a two year period, Counterclaim Defendants have anonymously attempted to access Mr. Kerik's social media accounts, anonymously attempted to access his, and his associates LinkedIn accounts, and succeeded in accessing Mr. Kerik's public Wikipedia page, under three different anonymous names, to make defamatory and embarrassing comments and entries on the page.

g.  At 2:55PM, March 5, 2015, immediately after the first announcement of Mr. Kerik's book's publication, Ms. D'Addio publicly posted a Twitter message to hundreds of followers, stating Mr. Kerik was gay, and taunting one journalist to question Mr. Kerik about his "prison gay opinions."

h.  After seeing a photo of Mr. Kerik and one of his young daughters on the Internet, at 6:20PM, March 14, 2014, Ms. D'Addio publicly posted a Twitter message to hundreds

of followers, "#Ironic felon liar Bernard Kerik using kid pic to soften image after BFF threatens me, family;" a statement that was not true, that she knew was not true, and that she posted for no other purpose but to harass and embarrass Mr. Kerik and his minor daughter.

i.  On April 15, 2015, Ms. D'Addio anonymously publicly posted a blog message followed by numerous Twitter messages to hundreds of followers, that Mr. Kerik's college degree from SUNY was a fraud; a statement that was not true, that she knew was not true, but she posted for no other reason than to publicly harass, embarrass and harm him personally, professionally and financially.

j.  At 5:05PM, May 28, 2015, Ms. D'Addio publicly posted a Twitter message to hundreds of followers, implying that Mr. Kerik was illegally or improperly taking funds out of an organization that Mr. Kerik created, when if fact, not only was the implication untrue, but Mr. Kerik has not received any compensation at all from the organization, other than two train tickets to Washington, DC for Congressional briefings.

k.  On October 10, 2015, D'Addio publicly posted an anonymous blog message that a private investigator by the name of John Curley, had identified himself as working for Bernard Kerik, and had threatened and harassed her, her sick relatives, her friends, her employer, and even her attorney. She then called Mr. Kerik's probation officer with the same claim. Ms. D'Addio was fully aware that her statement was false. (the two calls to Ms. D'Addio's attorney were recorded by Mr. Curley, and he is clear that he was not calling on behalf of Mr. Kerik, nor did he threaten anyone, yet Ms. D'Addio continues her false claims of being threatened).

l.  At 9:50PM, October 28, 2015, Ms. D'Addio publicly posted an anonymous Twitter message stating that John Curley trespassed to harass "innocents," in Mr. Kerik's name, even though she knew those statements to be untrue, since she had already been told by the New York State Police, and a U.S. Federal Probation Officer that it was a private process server attempting to serve her with a lawsuit, filed by Mr. Curley, having nothing to do with Mr. Kerik.

m.  On October 30, 2015, Ms. D'Addio called the New York State Police again to report that John Curley, on behalf of Mr. Kerik, had trespassed onto her property and harassed her. In reality, it was the same private process server on his second attempt to serve D'Addio with the lawsuit, filed by Mr. Curley, having nothing to do with Mr. Kerik. Ms. D'Addio was advised accordingly by the New York State Police, however she still called Mr. Kerik's probation officer and reported that Mr. Kerik had sent Mr. Curley to her residence to harass her.

n.  On November 2, 2015, Ms. D'Addio publicly posted an anonymous Twitter message to dozens of follows, implying that Kerik had harassed and threatened her and the New York State Police and federal probation did nothing about it, knowing her statement about Mr. Kerik was untrue.

o.  The above messages are just a few of the thousands of messages that Ms. D'Addio has posted publicly to alarm, harass, embarrass, and harm Mr. Kerik personally and professionally. She also has and continues to target the families, parents, children, and workplaces of Mr. Kerik's associates. Should anyone rebut her in anyway and tell her to stop harassing them, she begins a rant that she is being harassed and cyber bullied, when in fact; it is her that sought them out and attacked them in the first place. This

11

nightmare has been going on for more than two years. Even without the use of the Twitter accounts, 38 of which have been suspended by Twitter for Abuse/Harassment or impersonation, she still saturates the Internet with defamatory content on Mr. Kerik, his family, friends, associates and supporters, using any one of multiple blogs, websites, and Internet accounts, which includes her using electronic tags, Kerik, Bernie Kerik, Bernard Kerik, Bernard B. Kerik. So instead of the Internet capturing each one of her thousands of posts once, it registers each post four or five times, and she does that for numerous sites, all in an attempt to flood the Internet with negative, defamatory and embarrassing content about Mr. Kerik, his family, associates and friends.

25.     The Counterclaim Defendants' conduct has been continuous and unrelenting and, as such, is part of a continuous pattern of alarming conduct and can therefore be considered, for statute of limitations purposes, to be a single, continuous transaction.  However, even if they were not to be considered a single continuous transaction, there are still more than enough transactions which occurred within the statute of limitations that would be actionable.

26.     Each statement was false when made and there was no basis to make public statements implying that Mr. Kerik had engaged in any of the alleged misconduct.

27.     Ms. D'Addio has made false statements intentionally, with knowledge of their falsity and with actual malice toward Mr. Kerik, intending to injure Mr. Kerik and to deprive him of his good name, reputation, liberty and freedom.

28.     Ms. D'Addio knew or should have known that her statements were false at the time of the publication.

29.     Ms. D'Addio statements were published on the internet and were widely read by Mr. Kerik's family, neighbors, friends, business associates, and diverse other persons. In fact, as

of the time of this writing, 143,473 views were counted on Counterclaim Defendants' primary blog, and the number of viewers continue to increase.

30.     Mr. Kerik is the principal in The Kerik Group, LLC, a risk management consulting firm.

31.     Despite his prior conviction, Mr. Kerik's opinions are widely respected.  He has been called upon to brief and testify before congressional committees, and advise various elected officials on issues related to prison and criminal justice reform.  He is also a frequent contributor on television and in print media on issues of national security, police, corrections and criminal justice reform.

32.     Kerik also wrote and published a book, "From Jailer to Jailed." This book is part autobiography and part political commentary to call for reform of the criminal justice system.

33.     Ms. D'Addio's false statements were designed, and in fact did, impugn Mr. Kerik's reputation within his profession.  Specifically, Ms. D'Addio has targeted Mr. Kerik's book for attack, the same book for which she falsely claimed to be co-author and demanded money.

34.     In addition to the numerous posts on her websites, blogs, and social media profiles, Ms. D'Addio has flooded the Internet with negative and false reviews about Mr. Kerik's book, the same book that she falsely claims she co-authored and for which she has demanded money.  She even went so far as to file negative reviews on Amazon.com and Goodread.com, prior to the book even being published and released. For example:

                    a.  On March 25, 2015, several days before the book was actually released, Ms.
                        D'Addio created a fictitious Twitter, @JailertoJailed,, and began posting
                        numerous negative and false messages on that account, and forwarding

those messages to thousands of viewers, in an attempt to dissuade buyers from purchasing the book, and sellers from promoting it.

b. At 7:33PM, March 26, 2015, Ms. D'Addio posted a public Twitter message to hundreds of followers stating, "Felon Bernard Kerik uses MY WORK W/O CREDIT OR PERMISSION," and then sends copies of that message to CNN, Nightline, NBC Nightly News, and the Today Show, all networks that she anticipated would promote Mr. Kerik's book and have millions of viewers, knowing her message was not only false, but would negatively impact the book's release and sales.

c. At 1:19PM, April 10, 2015, Ms. D'Addio posted a public Twitter message to hundreds of followers, stating: "From Jailer to Jailed by accused plagiarist Felon Bernard Kerik tanks! #s don't lie," and linked the Amazon rating system to the book, promoting a negative image of the book, to negatively impact sales.

d. At 9:00AM on April 13, 2015, Ms. D'Addio posted another public Twitter message to hundreds of followers, stating: "More Woe for Bernie Kerik as From Jailer to Jail Tanks," and linked the Amazon rating system to the book, promoting a negative image of the book, to negatively impact sales.

e. At 12:08AM, April 20, 2015, Ms. D'Addio posted a public Twitter message read by hundreds of followers, attacking a New York based attorney, who had written a review on the Huffington Post concerning Mr. Kerik's book. When that attorney attempted to get Ms. D'Addio to stop her online attacks and rants, she wrote, "If you call me again, that "redemption of your butt

14

buddy, .@BernardKerik will be very short-lived. Are we clear?" Followed by another message: "Anybody else wanna play? Cus .@Bernard Kerik writes a new book tomorrow "From Jailer to Jailed to Jailed Again." The most alarming post, was at 11:41PM, that same day, close to 24 hours later, and after posting numerous messages all day long attacking the attorney, Ms. D'Addio posted a public message, stating: "Ask @BernardKerik & ---- If u really want 2 go there! What r u? Eight? Stop harassing me, jerk." What makes this message particularly alarming, is that Ms. D'Addio copied Mr. Kerik's 15-year old daughter on the message, something she has done on numerous occasions, for no other reason but to alarm and frighten his minor daughter.

    f.   On May 30, 2015, Ms. D'Addio posted a public book review and rating on Goodreads.com, rating the Mr. Kerik's book a one star, one day before the book was actually published and released, knowing that her rating would have a negative impact on book sales. She also attempted to do the same thing on Amazon, and then complained publicly when they refused to accept her review. This is extremely disturbing, as she has admitted in her own filing to the court, that she had not purchased and reviewed the book until April 2015, (See filing Paragraph 79/80) sometime after the book's publication and release, which clearly demonstrates that her intent was to intentionally hurt the sales and promotional opportunities for the book.

35.    Ms. D'Addio's statements, each on its face impugned Mr. Kerik's reputation, tended to expose Mr. Kerik to public contempt, ridicule, aversion or disgrace and intended to

induce an evil opinion of him in the minds of right-thinking persons, to cause him to be shunned or avoided, and/or to injure him in his profession.

36.     Ms. D'Addio's statements each have directly and proximately caused Mr. Kerik damages by virtue of his loss of reputation, shame, mortification, hurt feelings, and/or damage to his property, business, trade, profession, and/or occupation.

37.     All the false statements detailed above constitute defamation per se because they call into question the plaintiff's competence to perform adequately in his profession and allege serious criminal misbehavior by the plaintiff.

38.     Mr. Kerik has been damaged in an amount to be determined at trial, but in no event less than $1,000,000.

39.     In addition, because Ms. D'Addio's conduct was so willful, wanton and malicious, punitive damages should be awarded in an amount to be determined at trial, but in no event less than $1,000,000.

## AS AND FOR THE SECOND COUNTERCLAIM

### Intentional Infliction of Emotional Distress

40.     Counterclaimant repeats and realleges all the statements contained in the above paragraphs as if fully realleged herein.

41.     From soon after Mr. Kerik's release from prison in May 2013 and continuing through the present, Ms. D'Addio has intentionally or recklessly engaged in a continuous course of conduct, which was designed to cause severe emotional distress to Mr. Kerik.

42.     This continuous course of conduct includes continuous online postings designed to defame and publically humiliate Mr. Kerik, his family and associates, continuous attempts to have

16

Mr. Kerik falsely arrested, and the filing of a knowingly frivolous lawsuit.  This course of conduct is so outrageous and atrocious that it is utterly intolerable in a civilized community.

43.     Ms. D'Addio's conduct has been continuous and unrelenting and, as such, is part of a continuous pattern of conduct and can therefore be considered, for statute of limitations purposes, to be a single, continuous transaction.

44.     Ms. D'Addio has intentionally or recklessly engaged in extreme and outrageous conduct, which was intended to cause severe emotional distress to Mr. Kerik.  And, in fact, Ms. D'Addio's extreme and outrageous conduct in continuously targeting Mr. Kerik has caused him to suffer severe emotional distress.

45.     Mr. Kerik has been damaged in an amount to be determined at trial, but in no event less than $1,000,000.

46.     In addition, because Ms. D'Addio's conduct was so willful, wanton and malicious, punitive damages should be awarded in an amount to be determined at trial, but in no event less than $1,000,000.


## AS AND FOR THE THIRD COUNTERCLAIM

### Intentional Interference With Prospective Economic Advantage

47.     Counterclaimant repeats and realleges all the statements contained in the above paragraphs as if fully realleged herein.

48.     Counterclaim Defendants' activities have been designed to sabotage the sales of Mr. Kerik's book and have in fact significantly lowered sales.

49.     Counterclaim Defendants' public rants and attacks on Mr. Kerik's friends and supporters, have dissuaded event coordinators from moving forward on organizing events for

public speeches and book signings, out of fear of Ms. D'Addio's mental instability and potentially violent tendencies. On two occasions, after reading Counterclaim Defendants' Internet postings and Twitter messages, Mr. Kerik was contacted by event hosts, asking if they should employ security for the venue, out of fear that Ms. D'Addio would show up.

50.     Counterclaim Defendants have also posted several false book reviews on sites such as Goodreads.com in an effort to artificially lower the rating of the book and thereby hurt book sales.

51.     Counterclaim Defendants have established social media accounts falsely posing as the official account of the book and posted messages designed to drive down book sales.

52.     Mr. Kerik, through his publisher and agent, had a business relationship with several third parties, including, but not limited to, Amazon.com, and several book stores.

53.     Counterclaim Defendants' activities were designed to interfere with, and in fact did interfere with those business relations by negatively impacting book sales and causing cancellations of book signings.

54.     Counterclaim Defendants' acted with the sole purpose of harming Mr. Kerik and/or used dishonest, unfair, or improper means.

55.     As a result of Counterclaim Defendants' actions, Mr. Kerik's business relationships were injured through the significantly diminished sales of books, in an amount to be determined at trial.

WHEREFORE, Counter-Claimant Bernard B. Kerik demands judgment as follows:

a.   Dismissal of Plaintiff's Complaint in its entirety against Mr. Kerik;

b.   An award of compensatory and punitive damages to Kerik for defamation in an amount to be determined at trial.

c.  A permanent injunction restraining the Plaintiff from further publishing any and all
    communication between the Plaintiff and Defendant, in written, typed or emailed
    format; and restraining the Plaintiff from any and all direct, indirect or third party
    communication with the Defendant, or any members of his family, business associates,
    or company whether directly or indirectly, in person, by traditional mail, including but
    not limited to USPS, UPS, FedEx, and any other carrier, or any other form of
    communication, including but not limited to any and all electronic communications,
    whether direct or indirect through the use of the Internet, including but not limited to
    any and all electronic communications facilitated via the internet through cable, wifi,
    cellular services to include cell site and tower transmissions, land line, and any other
    method of electronic message transmission to include, but not being limited to the
    airwaves, wires, cables, wifi, cellular services, frequencies, cloud storage, or other
    methods of transmissions facilitated through e-mail, social media sites, including but
    not limited to any and all blogs and social media sites such as Facebook, Twitter,
    LinkedIn, MySpace, Digg, Instagram or SnapChat. Any and all communications are
    also prohibited through the use of storage devices, including but not limited to USB
    Thumb Drives, SD and Micro SD Cards, Computer Hard Drives and Solid State Drives,
    Optical Media, or any other external media or internal storage drives which can be used
    to store, transfer and transmit data. Any and all communications are prohibited via any
    and all electronic sites that include, but are not limited to internet web blogs, newspaper
    blogs and advertisements to include any apps or any other electronic media used to post
    electronic communications whether written text or photographic items, or anything that
    can be construed as intended to communicate any type of message whether electronic

19

or other, which is expressly prohibited by this order and for which its intended use is to directly or indirectly communicate with the Defendant, or any of his family members, business associates or his company.

d.  An award of the costs and disbursements of this action;

e.  Such other, further and different relief as to the Court may seem just and proper.

Dated: December 18, 2015
New York, New York

Respectfully submitted,

/s/ Timothy C. Parlatore

Timothy C. Parlatore, Esq.
*Attorney for Bernard B. Kerik*
260 Madison Avenue, 22nd Floor
New York, New York 10016
212-679-6312
212-202-4787 Facsimile
tim@parlatorelaw.com